**Temistocles RAMIREZ de ARELLANO, et al., Appellant**

v.

**Caspar W. WEINBERGER, Secretary of Defense, et al.**

No. 83–1950.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1983.

Decided Dec. 22, 1983.

Rehearing En Banc Granted Feb. 23, 1984.*

* Judgment and opinion vacated.

Mark R. Joelson, Washington, D.C., with whom Donald H. Green, Greer S. Goldman and Lucy F. Reed, Washington, D.C., were on brief, for appellants. Mark N. Bravin and John F. Daly, Washington, D.C., also entered appearances for appellants.

John M. Rogers, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Michael F. Hertz, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees. R. Craig Lawrence, Stuart H. Newberger, Asst. U.S. Attys., and Marc Johnston, Atty., Dept. of Justice, Washington, D.C., also entered appearances for appellees.

Before WILKEY and SCALIA, Circuit Judges, and LUMBARD,* Senior Circuit Judge for the United States Court of Appeals for the Second Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

Dissenting opinion filed by Circuit Judge WILKEY.

SCALIA, Circuit Judge:

This is an appeal by plaintiffs Ramirez, two Puerto Rican corporations, and four Honduran corporations from dismissal of their suit against the Secretary of Defense claiming wrongful occupation of their property in Honduras for use as a training facility for Salvadoran soldiers. The district

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

court granted defendants' motion to dismiss, on the ground that the case presented a nonjusticiable political question. We disagree with that basis of dismissal but affirm because in other respects the plaintiffs have failed to present a claim upon which injunctive or other relief can be granted.

I

■ Accepting as true the allegations contained in plaintiffs' pleadings and affidavits,[1] the facts of the case are as follows: One of the plaintiff Honduran corporations owns a large tract of land in the northern portion of Honduras, on which the two other Honduran corporations conduct, respectively, a cattle ranching and shrimp packing business. These three Honduran corporations are owned by the fourth Honduran corporation, which is in turn owned by one of the plaintiff Puerto Rican corporations, which, finally, is owned by the second Puerto Rican corporation (owned by plaintiff Ramirez) and by Ramirez, an American citizen. The plaintiffs' total investment in the property is approximately $13,000,000.

Still accepting the plaintiffs' view of the facts: In late March 1983, the Defense Department decided to establish in Honduras a Regional Military Training Center at which American military specialists would train Salvadoran soldiers. The Defense Department selected the site, which turned out to be the plaintiffs' ranch. While the fact of its private ownership may not have been known initially, after that came to light the Department still refused to change its plans, and proceeded with construction. The base was originally to be located on 1,500–2,000 acres, but it has expanded onto an additional 5,300 acres, so that it occupies about half of the total ranch and about 90% of the year-round grazing land. Permanent facilities include a tent camp, buildings, ammunition storage areas, and a firing range. About one hundred Green Berets and 1,000 other soldiers, including Honduran troops who are participating in the exercises, are now living and training on the land. As a consequence of the construction of the base and the conduct of its activities, prime grazing land and fences have been bulldozed, the flow of water to the meat packing plant has been interrupted, cattle have been shot by stray bullets, the animals in the occupied area have become undernourished, and ranch employees have refused to work in areas where the training is taking place. No eminent domain proceedings, Honduran or American, have been conducted, and no compensation paid plaintiffs, although Honduran proceedings have been discussed with plaintiff Ramirez by Honduran officials.[2]

The plaintiffs filed a complaint in the United States District Court for the District of Columbia. They alleged that their property had been seized and damaged without statutory or constitutional authority, that they had been deprived of property without due process of law, and that a tort had been

1. Although the district court's dismissal was in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), in support of and in opposition to that motion the parties offered evidence extrinsic to the pleadings, which the court did not exclude. Under such circumstances, Rule 12(b)(6) provides that "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Local Rule 1–9(h) provides that with each motion for summary judgment "there shall be served and filed ... a statement of the material facts as to which the moving party contends there is no genuine issue." Plaintiffs complain of the district court's failure to require compliance with this rule. We find it unnecessary to pass upon this assigned error and the related contention that the district court relied upon facts in the defendants' submissions that were not uncontroverted. We consider this case entirely on the basis of the facts set forth in the complaint and the plaintiffs' affidavits, accepting all of them as true. If the district court's judgment is sustainable on that basis, no such errors could have affected the substantial rights of the plaintiffs. *See* 28 U.S.C. § 2111 (1976).

2. The dissent makes much of "the district court's statement ... that 'there are some essential disputes as to the material facts in the case.'" Dissent at 159. There are indeed disputed facts, but we have resolved all disputes in the light most favorable to the plaintiffs, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1966), and still find that the plaintiffs have failed to state a claim. Under those circumstances, it is proper to dismiss.

committed against the Honduran corporations giving rise to a claim under the Alien Tort Statute, 28 U.S.C. § 1350 (1976). They requested an injunction, a declaratory judgment and such other relief as the court deems just and proper.

## II

■ The district court found that these allegations presented a nonjusticiable political question, because, to repeat the most salient concrete points, (1) " 'it is not the function of the Judiciary to entertain private litigation—even by a citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region,' " Mem.Op. at 9–10, *quoting Johnson v. Eisentrager,* 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950); (2) adjudication of the matter would "necessarily involve sensitive and confidential communications between the highest members of the Executive branch and officials of a foreign power that are not judicially discoverable," Mem.Op. at 6; and (3) judicial intervention would interfere with the conduct of our foreign affairs in Central America, *id.* at 5–6, 9. We do not agree with this basis of dismissal.

The plaintiffs do not seek adjudication of the propriety of the American military presence in Honduras, but of a narrower issue: whether United States officials have, by their actions, unlawfully deprived them of the use of their land. Unlike the issue to which the Court's statements in *Eisentrager* were addressed—the constitutionality of the presence of United States armed forces in China—this is the kind of question that is highly appropriate for judicial resolution. Adjudication of land disputes is perhaps the primeval function of common-law courts, and from the earliest times federal courts in this country have not shrunk from the task, even where ownership of a fort occupied by the United States was at issue. *See Meigs v. M'Clung's Lessee,* 13 U.S. (9 Cranch) 11, 3 L.Ed. 639 (1815); *see also Grisar v. McDowell,* 73 U.S. (6 Wall.) 363, 18 L.Ed. 863 (1868). To be sure, because this case involves land in Central America, and because United States military activities in that region are currently the subject of national interest and debate, the issue is presented in a more politically charged context. That may make it, in a sense, a political *case* —but as the Court noted in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), "[t]he doctrine ... is one of 'political questions,' not one of 'political cases.' "

■ As to the problem of "sensitive and confidential communications between the highest members of the Executive branch and officials of a foreign power": On the basis of a bare complaint, a motion to dismiss and related affidavits, we cannot say that resolution of this question will require discovery of such materials. The existence of the base is no secret, and we see no reason why communications that sustain the Department's defense of Honduran approval and control would necessarily be sensitive. If and when Executive privilege is asserted and it develops that essential evidence is therefore undiscoverable, there will be time enough to dismiss. *See Halkin v. Helms,* 690 F.2d 977 (D.C.Cir.1982); *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir.1978) (prior disposition of connected case).

■ The district court's concern about interfering with our foreign policy of providing assistance to threatened governments of Central America is a valid one. Such damage would arise, however, not from our mere resolution of the issue whether United States forces are in possession of the plaintiffs' land, but from injunctive relief, should we choose to provide it, which would bring the present operation to a halt. It is relevant, as we shall discuss below, to the nature of the remedy which plaintiffs can obtain—but not to the "political" character of the question we have been asked to resolve.

## III

■ A federal appellate court may affirm the judgment appealed from on grounds different from those offered by the rendering court. *Langnes v. Green,* 282

U.S. 531, 538–39, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931). Although we find dismissal was not warranted on the ground that this case presents a political question, we nonetheless affirm the district court's order because for other reasons the plaintiffs have failed to state a claim upon which relief can be granted.

■ The first remedy plaintiffs have requested is an injunction. General principles of equity, preserved in actions under the Administrative Procedure Act, *see* 5 U.S.C. § 702 (1982), would preclude the grant of injunctive relief here. The issuance of an injunction is discretionary, and where that remedy will intrude into the conduct of foreign affairs it should be granted only on an extraordinarily strong showing. *Cf. Adams v. Vance*, 570 F.2d 950 (D.C.Cir.1977). It can hardly be thought that requiring disbanding of a training camp for troops of a friendly country (El Salvador) that is now engaged in substantial defensive military operations does not intrude on the conduct of foreign affairs. And we cannot even be certain that no more than training is involved. It is not far-fetched to speculate, for example, on what the effect of the injunction here sought would have been if it had issued a few months back, and if this base were then being used as a staging area for our recent military operations in Grenada. Nor can we expect or require the Executive to take us into its confidences regarding the activities it has in hand. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). The fact is that in enjoining a United States military operation of this sort we have no idea what harm we may be doing. If this does not mean that we can never take such action, it at least means that an overwhelming showing of need must be made.

■ If it be assumed, on the other hand, that the camp will not be disbanded, but merely restricted to adjacent lands not owned by the plaintiffs which it currently may occupy,[3] we encounter the difficulty that injunctions are generally considered inappropriate where they would require continuing supervision by the courts. 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2942 at 376 (1973). It is not enough to say that we need not worry about that factor here, since the object of the injunction is the executive branch, which can be relied upon to obey our decree. If the training operations continue, there are likely to be ongoing disputes over whether incursions onto the plaintiffs' property from adjacent lands have occurred— and if so, whether United States, Honduran or Salvadoran forces were responsible. The difficulty of supervision would be increased by the fact that we would need to monitor compliance with our injunction in Honduran territory. Even among the states of this Union courts generally will not enjoin a trespass in another jurisdiction. *See* Annot., 113 A.L.R. 940 (1938); RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 87 com-

---

**3.** This is the only alternative. The dissent's hypothesis, Dissent at 170, that the camp could be relocated at a distance from the plaintiffs' property is simply euphemism for closing down the existing camp and opening a new one. The dissent's position on this point amounts to saying that, before we can conclude that there is an intrusion upon foreign affairs, we must find that an equivalent training camp could not be established elsewhere—or must at least permit the plaintiffs to demonstrate that one *could* be established elsewhere. We think ourselves poorly qualified to judge the relative geopolitical and military advantages of various sites for training camps (assuming that training is the sole objective), and think the closing down of an existing camp to be in and of itself an intrusion. Thus, the only conceivable alternative to the conclusion that an injunction would constitute an intrusion (and even this alternative may represent too much of a concession) is the possibility that the existing camp could continue to function on lands which it may now occupy adjacent to plaintiffs' property. We had not considered the possibility raised by the dissent, *id.* at 163 n. 36, that the injunction could exclude from its prohibitions that portion of the ranch known as the "designated area," since the plaintiffs claim full ownership rights in that portion as well as in the rest of the ranch. In any event, even if the district court's equitable decree permitted continuing unlawful occupation of the "designated area," the problems of supervision would be precisely the same as those we are about to discuss with regard to the alternative of adjacent lands.

ment d (1971).[4] And the fact that the supervision would relate to an ongoing military operation adds separation of powers concerns to the factors weighing against injunctive relief. *Cf. Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Rizzo v. Goode,* 423 U.S. 362, 377–80, 96 S.Ct. 598, 607–608, 46 L.Ed.2d 561 (1976) (same effect produced by federalism concerns).

■ A further factor is the reluctance of courts to issue injunctions that "impugn

foreign law," *see Steele v. Bulova Watch Co.,* 344 U.S. 280, 289, 73 S.Ct. 252, 257, 97 L.Ed. 252 (1952), or call into question the legality of action by the officials of other governments under their own law, *see Porto Rico Telephone Co. v. Puerto Rico Communications Authority,* 189 F.2d 39, 41–42 (1st Cir.1951), *cert. denied,* 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628 (1951).[5] It appears from the materials offered by the plaintiffs that Honduran forces are taking part in and even helping to supervise this exercise.[6] In halting or redirecting the exercise on the

**4.** The dissent points out that "[c]ourts often properly issue equitable decrees involving property outside the jurisdiction of the court." Dissent at 168. That is true in respects not pertinent here—notably, where the property in question is personalty (which was the case in *Phelps v. McDonald,* 99 U.S. (9 Otto) 298, 25 L.Ed. 473 (1879), quoted by the dissent). Even when realty is involved, certain equitable decrees will issue as a matter of course, *e.g.,* decrees requiring execution of a deed, which can be done, of course, in the state where the decree is rendered regardless of where the land is found. But when it comes to enjoining a trespass in another jurisdiction, the great weight of authority supports our statement in text. *See* 42 Am.Jur.2d *Injunctions* § 151 (1969); 92 C.J.S. *Venue* § 38b (1955).

**5.** The Defense Department here contends that the presence of our forces is only at the invitation of the Honduran government, which ultimately determines and controls the location of the training activities. Since that allegation is controverted, it cannot be considered in the context of this 12(b)(6) motion as a basis for invoking the act of state doctrine. *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918).

**6.** This is the only fact for which we rely upon information contained outside the plaintiffs' complaint. It involves no "speculation favorable to the defendants," Dissent at 159, or "slant of the inferences" in favor of the defendants, *id.,* but is contained explicitly in sworn affidavits submitted by the plaintiffs:

I and my men have observed military activities carried out almost every day in the Taya Crique and the Los Presos sections. Green Berets, and Honduran and Salvadoran soldiers enter and leave by car and on foot, loaded with military equipment.

Castro Declaration at 1, filed July 25, 1983.

Almost daily during the past three weeks, I, my family and other workers have seen American soldiers (Green Berets), and Salvadoran and Honduran soldiers enter the sec-

tion of Taya Crique, that is located on the other side of the highway, right across from my house. They enter in groups of various sizes, sometimes of up to 70 or 100 soldiers.

Reyes Declaration at 1, filed July 25, 1983.

I have asked United States and Honduran Military Officials in charge of the Regional Military Training Center to Escort my workers into the fields . . . .

Ramirez Third Supplemental Declaration at 3, filed Sept. 7, 1983. None of the affidavits asserts, as the dissent maintains, that "Honduran troops were not involved in the U.S. excursions onto the plaintiffs' property," Dissent at 159 n. 14, but only that Honduran troops did not participate in the "reconnaissance" and "surveying and measuring" which resulted in the selection of this particular site for the training camp. That is, of course, a crucial fact for the plaintiffs, and as our statement of the case shows we have assumed it in their favor ("The Defense Department selected the site," *supra,* p. 3). It is undisputed, however, that Honduran troops are participating in this operation.

The dissent views this case as one in which the district court has "improperly relie[d] on factual materials outside the complaint and construe[d] those materials in favor of the defendants," whereupon our function is "to review and correct [that] error" without ourselves resorting, of course, to the extra-complaint materials. Dissent at 159. Even if this view were correct, its effect would be to exclude only the fact here under discussion, which is not central to our opinion so that its exclusion would not alter our result. But these affidavits need not and indeed cannot be disregarded. Rule 12(b)(6) *requires* that when such material has been submitted and received, the motion to dismiss "shall be treated as one for summary judgment"—which means, of course, that the materials shall be considered. The plaintiffs' only contention on appeal in this regard has not been that the materials beyond the complaint should not have been considered, but rather that those portions of such materials favorable to the defendants and not uncontroverted should not have been used to support

ultimate ground that it violates the plaintiffs' property rights under Honduran law, the requested injunction would incidentally affect the activities of the Honduran troops as well, and would as a practical matter accuse them of having violated their own law in their own territory.

■ Whether or not any of the above factors in isolation would suffice to preclude injunctive relief, in combination they establish a formidable obstacle which the equities of plaintiffs' case cannot overcome. Plaintiffs acknowledge that they "have not [gone to Honduras for relief] and ... do not intend to do [so]." July 14, 1983 Tr. at 52. We think it remarkable that these plaintiffs, four of which are Honduran corporations and the rest of which have voluntarily chosen to profit from the resources of Honduras by conducting ranching and shrimp packing operations there through Honduran corporations, should take initial resort to the courts of this country with regard to a dispute concerning Honduran land. *See generally Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 158–59 (2d Cir.1978) (en banc). Plaintiffs assert (in the context of their argument on another point) that it does not "seem likely that these defendants, all of whom are United States government officials, would submit to the jurisdiction of Honduran courts." Supp. Brief for Appellants at 14. That is irrelevant for purposes of the point made here. Honduran courts unquestionably have jurisdiction over the individuals performing the activity that allegedly violates plaintiffs' property rights in Honduran land under Honduran law—which is all that is necessary to effect the injunctive relief plaintiffs seek.

It is true that the plaintiffs assert constitutional claims that presumably cannot be considered in a Honduran forum. But those claims are entirely derivative of claims under Honduran law. Plaintiffs are suffering no injury at the hands of the Defense Department unless their property rights under Honduran law are being impaired; and will be made entirely whole if those rights are vindicated (where real property rights are ordinarily vindicated) in the local courts. The impropriety of this court's issuing an injunction that rests upon such an inquiry is not affected by the fact that unlawful conduct by agents of the Executive is alleged. Where government officers violate rights under our laws that are utterly independent of what foreign law may permit—for example, the Fourth Amendment's guarantee against unreasonable searches of our citizens—injunctive relief against such action abroad is appropriate (and, indeed, could presumably *only* be granted by our courts). *See, e.g., Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144, 154, 156 (D.D.C.1976). But where, as here, the essence of the claim is that government officers have violated the plaintiffs' property rights under Honduran law; and where the practical effect of the constitutional guarantee in question is no more than a waiver of sovereign immunity with regard to such violation; we deem the propriety of our intervention by injunction no greater than it would be in a similar suit against a private individual subject to our jurisdiction. At this stage, at least, our intervention by injunction is inappropriate.

Another factor leading to the same conclusion is the availability of monetary relief in other United States courts. Our unwillingness to grant an injunction does not leave the plaintiffs remediless, even in this country. To the extent their allegations state valid causes of action, the plaintiffs would have a valid claim for monetary relief for a Fifth Amendment taking without just compensation, which they can bring under the Tucker Act, 28 U.S.C. § 1491 (1976), in the Claims Court. Plaintiffs have avoided use of the word "taking" in their

the district court's decision. As indicated in note 1, *supra,* we have avoided all possibility of this defect in our decision by considering only the *plaintiffs'* extra-complaint materials. But beyond the technicalities, we do not see how the dissent thinks we can possibly do harm to

the "substantial rights" of the plaintiffs, *see* 28 U.S.C. § 2111 (1976), if we affirm the district court on the basis of submissions which the plaintiffs made to the district court, cited in their briefs before us, and referred to in their oral argument.

written submissions and during oral argument, presumably out of concern that they might be relegated to their Tucker Act remedy. One of the counts in their complaint, however, is for the "unconstitutional and unauthorized seizure, destruction and deprivation of plaintiffs' use and enjoyment of property," and if the kind of activity they claim has occurred, it clearly constitutes a sufficient interference with their use and possession of property to be a taking. *See United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922); *Branning v. United States,* 654 F.2d 88 (Ct.Cl.1981). Applicability of the Tucker Act cannot be avoided by merely omitting the talismanic word "taking."

The dissent argues that under the state of facts alleged in the complaint the Tucker Act remedy is not available, since the Tucker Act precludes recovery for acts by government agents beyond their statutory or constitutional authority. Of course if that is correct, the American plaintiffs' *sole* remedy against the United States in this case would be injunctive relief,[7] and they could recover nothing for the damage done to the property so far. There is no need to adopt such an extreme position. The dissent misunderstands the Tucker Act authority requirement.

▮▮▮ It is well established that the mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not "authorized" to break the law. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). If a taking

occurs while he is acting within the normal scope of his duties (a concept akin to, though not as liberal as, the "scope of employment" test for application of the doctrine of *respondeat superior* in private law[8]), a Tucker Act remedy normally lies, unless Congress has expressed a positive intent to prevent the taking or to exclude governmental liability. The cases cited by the dissent involved the latter exception to the rule. In *Hooe v. United States,* 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910), the lessor of the building in which the Civil Service Commission was housed refused to renew the lease for $4,000, and wanted $6,000 instead. After Congress refused to increase the appropriation, the Secretary of the Interior reached agreement to lease the building without the basement for $4,500, which Congress appropriated. The Commission, however, continued to use the basement for six years. When the lessor sought to recover an additional $9,000 under the Tucker Act (the difference between $4,500 and $6,000 for six years), the Court held that he could not, because under the circumstances the Commission had no power to bind the government. The Supreme Court has specifically distinguished *Hooe* from other Tucker Act cases on the ground that it involved "specific limitation on the agent's authority." *Larson v. Domestic & Foreign Commerce Corp., supra,* 337 U.S. at 701 n. 24, 69 S.Ct. at 1467 n. 24. Likewise, in *United States v. North American Transportation & Trading Co.,* 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920), the Court held that a taking of the plaintiff's property by a subordinate military officer was not compensable under the Tucker Act since the applicable statute had explicitly conferred confiscation power only upon the Secretary of War.[9] And in *Southern California Fi-*

---

**7.** The Federal Tort Claims Act excepts damage occurring abroad, and thus would not be available. 28 U.S.C. § 2680(k) (1976). The dissent expresses no opinion regarding the validity of the Alien Tort Statute claim, hence under its view the *Honduran* plaintiffs might have a money remedy.

**8.** *See* 1 RESTATEMENT (SECOND) OF AGENCY § 244 at 537 (1958):

A master is subject to liability for a trespass or a conversion caused by an act done by a servant within the scope of employment.

**9.** The Secretary had actually exercised that power at a later date. The original taking by a subordinate officer was relevant only because, if it had been effective to raise a Tucker Act claim, the plaintiff's claim was time-barred. The Court in effect denied a Tucker Act remedy in order to preserve one.

nancial Corp. v. United States, 634 F.2d 521 (Ct.Cl.1980), cert. denied, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981), the Court of Claims found that the alleged taking by the Air Force would violate legislation that expressly required Congressional approval for military condemnations of United States land with a value of over $50,000. Id. at 523–25.[10]

On the other hand, on numerous occasions when the government agent was acting within the ordinary scope of responsibilities conferred on him by Congress, and took private property without express statutory authority or prohibition, the Tucker Act remedy was held to lie. Thus, in United States v. Causby, supra, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, the Civil Aeronautics Authority approved a path of glide for planes that allowed them to take off and land 83 feet above the plaintiffs' property, effectively destroying its use as a chicken farm. While Congress had authorized a taking of "navigable air space," that was defined as "airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority," at the time from 300 to 1000 feet above ground. Id. at 260, 263–64, 66 S.Ct. at 1065, 1066–1067.

No other takings were authorized. Despite this Congressional silence—if not negative implication—the Court concluded that the deprivation of use of the land constituted a compensable taking, for which recovery could be had in the Court of Claims. Similarly, in Portsmouth Harbor Land & Hotel Co. v. United States, supra, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, the government had built a fort on the shore opposite plaintiffs' island and intended to fire cannon shot over it with some regularity. The plaintiffs claimed that gunfire from the fort would effectively destroy use of the island as a summer resort, amounting to a taking. The Court found that this stated a cause of action, although no specific authority from Congress was alleged for the taking. While stating that it was open to the defendants to try to show lack of authority, the Court also observed that "[a]s the United States built the fort and put in the guns and the men, there is a little natural unwillingness to find lack of authority to do the acts even if the possible legal consequences were unforeseen." Id. at 330, 43 S.Ct. at 137.[11] See also Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962) (forest rang-

---

**10.** It is questionable whether the outcome in Southern California Financial Corp. was correct, since the Court of Claims has subsequently held that the statute at issue, now 10 U.S.C. § 2662(c) (1982), only applies to formal acquisitions and condemnations, and not to so-called "inverse condemnations" such as that represented by the present suit, in which the plaintiff is alleging under the Tucker Act a taking that the government denies. Armijo v. United States, 663 F.2d 90, 96–97 (Ct.Cl.1981). While Armijo seeks to distinguish Southern California Financial Corp., the effort does not seem to us notably successful.

The holding and reasoning of Armijo apply as well to the companion statutory provision which the dissent believes may preclude Tucker Act relief in the present case—10 U.S.C. § 2676 (1982), which states that "no military department may acquire real property not owned by the United States unless the acquisition is expressly authorized by law." That provision is obviously meant to control the military's use of unrestricted appropriated funds for the acquisition of real estate, and has nothing to do with eliminating the safety net of Tucker Act relief in inverse condemnation cases against the military. See generally Re-

gional Rail Reorganization Act Cases, 419 U.S. 102, 125–36, 95 S.Ct. 335, 349–350, 42 L.Ed.2d 320 (1974). To our knowledge, such a vast exemption from Tucker Act liability for actions by the armed forces has never been suggested; the many cases that impose such liability should eliminate the dissent's concern on this point. See, e.g., Branning v. United States, supra, 654 F.2d 88; Foster v. United States, 607 F.2d 943 (Ct.Cl.1979).

**11.** It is of no significance, as the dissent thinks, that the Court in Portsmouth "remanded the case to the Court of Claims for a determination whether there was in fact sufficient authority" to support Tucker Act relief. Dissent at 165. Since the suit in Portsmouth had been brought in the Court of Claims, to avoid the necessity of remand the Supreme Court would have had to make precisely the opposite determination of that involved here—namely, that it could not be found that the government officers were acting within the normal scope of their duties. As the Court's discussion shows, the facts of the case would not support that determination. Moreover, Portsmouth arose on a pure demurrer, so that the parties there, unlike here, had had no opportunity to make evidentiary submissions.

er's occupation of plaintiffs' land gave rise to taking compensable in Court of Claims where he exceeded no express statutory limit on his authority); *United States v. Lynah,* 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903) (flooding of plaintiffs' plantation as a result of congressionally authorized construction of dam gave rise to compensable taking although no specific act of Congress directed the appropriation); *Great Falls Mfg. Co. v. Attorney General,* 124 U.S. 581, 8 S.Ct. 631, 31 L.Ed. 527 (1888) (where Secretary of War took lands not within a survey even though Congress had authorized taking only on the basis of the survey, if Secretary did not take more than reasonably necessary for purposes authorized by Congress and honestly and reasonably exercised his discretion, compensable taking occurred); *Mallow v. United States,* 161 Ct.Cl. 446 (1963) (plaintiff could recover under the Tucker Act a fine assessed under an unconstitutional statute).[12]

▆ We know of no case where mere Congressional failure expressly to authorize a taking that occurs as a consequence of a federal officer's discharge of his normal responsibilities has been held to preclude Tucker Act recovery. And we would find

such a general bar to recovery no more recommended by policy than supported by precedent. Since the officials of the Defense Department in the present case were performing their ordinary responsibilities of deploying United States military forces and of planning and operating a training facility for the military forces of a friendly country, we have no doubt that, if there was a taking, a Tucker Act suit would lie.[13]

▆ We conclude, therefore, that injunctive relief would be inappropriate, and turn to the next remedy specifically requested by the plaintiffs, declaratory judgment. That, like injunctive relief, is discretionary with the court. *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 494–96, 62 S.Ct. 1173, 1175–1176, 86 L.Ed. 1620 (1942). Where it would have the same negative effects as an injunction, the same prudential considerations which preclude the one preclude the other. *See Samuels v. Mackell,* 401 U.S. 66, 69–74, 91 S.Ct. 764, 766–768, 27 L.Ed.2d 688 (1971). The effect of a declaratory judgment in the present case will be to obligate the Secretary of Defense, in light of his oath to uphold the Constitution, either to withdraw the troops from the disputed area (thus making the declaratory

**12.** *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the case on which the plaintiffs and dissent rely heavily for the contention that defendants here were acting outside their authority, obviously assumed that the question of lack of authority for Tucker Act purposes is distinct from that of lack of constitutional authority, since it discussed them entirely separately (*compare* Part I of the opinion, *id.* at 584–85, 72 S.Ct. at 865–866, *with* Part II, *id.* at 585–89, 72 S.Ct. at 865–866, 867–868), and resolved only the latter.

**13.** The dissent's argument that the Tucker Act remedy is inadequate because the type of property damage here alleged is immeasurable in money terms need not detain us, since it would read the government's eminent domain power out of the Constitution. The dissent's view, that the threat to Ramirez's physical safety constitutes irreparable harm, would be correct if the government were seeking to harm Ramirez. In fact, however, the threat to his physical safety arises only because of his continuing occupation and use of the land. It is not the law that a taking can be enjoined whenever the government puts land it takes to a new use

which is hazardous to the former owner who tries to retain possession.

We do not understand the dissent's complaint that, since the issue of availability of a Tucker Act remedy "is intertwined with the merits of the plaintiffs' case," our holding "impermissibly decides the merits of the plaintiffs' case on review of a dismissal for lack of jurisdiction," Dissent at 166. In the first place, it is entirely proper for an appellate court to affirm on the merits a dismissal based on jurisdictional grounds. *See Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 797–98 & n. 1 (2d Cir.1980). In the second place, jurisdictional issues are frequently intertwined with the merits and such issues are just as frequently disposed of on review. When, for example, a complaint is dismissed on standing grounds because the plaintiff is not arguably within the "zone of interests" protected by the statute under which he sues, that jurisdictional issue necessarily determines the merits question of whether he is entitled to relief under the statute. *See, e.g., Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 143–45 (D.C.Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

judgment equivalent to the injunction we have found inappropriate) or to compensate the plaintiffs (thus making the declaratory judgment equivalent to a successful Tucker Act suit). But since the taking for which the complaint seeks full relief concededly involves property worth in excess of $10,-000,[14] exclusive Tucker Act jurisdiction lies in the Claims Court. 28 U.S.C. § 1346 (1976). Under such circumstances, it would be inappropriate for the district court to grant a declaratory judgment, it being well settled that the jurisdiction of the Claims Court cannot be evaded by framing a complaint to seek only declaratory relief. *Amalgamated Sugar Co. v. Bergland,* 664 F.2d 818, 823–24 (10th Cir.1981).[15]

█ The plaintiffs have also requested such other relief as the court deems just and proper. As for remedies (available to the Honduran corporations alone) under the Alien Tort Statute: Assuming without deciding that that legislation allows suits against the United States, it nonetheless applies only to so-called transitory causes of action. Neither an action seeking ejectment nor an action seeking money damages for trespass would lie, since they are both local actions. *See Ellenwood v. Marietta Chair Co.,* 158 U.S. 105, 15 S.Ct. 771, 39 L.Ed. 913 (1895); *Pasos v. Pan American Airways, Inc.,* 229 F.2d 271 (2d Cir.1956); *Livingston v. Jefferson,* 15 Fed.Cas. 660 (C.C.D.Va.1811) (No. 8411) (Marshall, Circuit Justice); RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 87 comment d (1971).

█ The only other relief the district court can grant is monetary compensation under the Tucker Act. (The Tucker Act remedy precludes a separate damage award not only for the allegedly unconstitutional taking, but also for the alleged deprivation of due process of law related to the taking. *Stringer v. United States,* 471 F.2d 381 (5th Cir.1973), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973).) But the district court's Tucker Act jurisdiction is limited to claims for less than $10,000, those of greater amount being reserved to the exclusive jurisdiction of the Claims Court. 28 U.S.C. §§ 1346, 1491 (1976). As noted above, that jurisdictional limit is exceeded by the value of the taking for which, on its face, the complaint seeks full relief.[16]

Since we resolve this case on other grounds, we do not pass upon the constitutional questions presented by the complaint. The dissent, however, must reach these questions,[17] and we are surprised that it finds them so readily resolvable in the plaintiffs' favor, Dissent at 157 n. 9. It is at least not clear that the plaintiff Honduran corporations have rights under the United States Constitution with regard to activity taking place in Honduras. *See Pauling v. McElroy,* 278 F.2d 252, 254 n. 3 (D.C.Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); L. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 267

14. As noted earlier, the plaintiffs assert that their total investment in the property is now worth $13,000,000, Appellants' Motion for Injunction Pending Appeal at 6, and that about half the property and about 90 percent of the year-round grazing land is occupied by the base, *id.* at 40.

15. Where, as here, the effect of a declaratory judgment is the same as the effect that would be produced by success in a Tucker Act suit, we do not understand what further psychological inquiry the dissent would conduct in order to establish that the former is a "pretext" for the latter. Dissent at 172. While some opinions may choose to characterize the equivalency as a pretext, not all do so, *see Amalgamated Sugar Co. v. Bergland, supra,* and no case we are aware of elevates that characterization to an actual substantive requirement.

16. Since the plaintiffs have not specifically sought monetary relief, and since there is no impending time bar that would prevent the refiling of this action, if plaintiffs so desire, in the Claims Court, we do not transfer this case to the Claims Court under 28 U.S.C.A. § 1631 (1983 Supp.). *Cf. Eccles v. United States,* 396 F.Supp. 792, 796–97 (D.N.D.1975).

17. The reason it must reach them is not, as the dissent suggests we are asserting, Dissent at 157 n. 9, that they are both standing issues. (As to the American plaintiffs, at least, there is injury in fact and an arguable claim under the Constitution, though not necessarily a claim that is valid.) Rather, the dissent must reach these issues because, unless they are resolved in the plaintiffs' favor, the judgment below must stand.

(1972). *But see United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). *See generally Johnson v. Eisentrager, supra,* 339 U.S. at 771, 70 S.Ct. at 940.[18] The constitutional claims of Ramirez and the Puerto Rican corporations rest entirely upon injury done to the Honduran corporations in which they are shareholders. Despite the dissent's assertion that "[i]t has hitherto never been suggested that the constitutional rights of American citizen investors ... were in any way lessened by the mere utilization of such corporate vehicles," Dissent at 158 n. 9, we know of no case in which the corporate veil has been pierced (or, more precisely, in which the corporate shareholders have been permitted to cast it off) to enable a constitutional right that belongs only to the shareholders to be asserted against action taken with regard to the corporation. *See, e.g., Reamer v. Beall,* 506 F.2d 1345 (4th Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 431 (1975) (sole shareholder of professional corporation unable to assert his Fifth Amendment privilege against self-incrimination on behalf of corporation); *United States v. Richardson,* 469 F.2d 349 (10th Cir.1972) (shareholder of Subchapter S corporation—same). Such a practice would effectively drain of content the venerable principle that corporations, since they are not "citizens," have no "privileges or immunities" under the Fourteenth Amendment. *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 177–80, 19 L.Ed. 357 (1868). It is suggestive in this regard that in dealing with warrantless surveillance, a matter supremely evocative of constitutional concerns, both Congress and the President have required unincorporated associations to be treated as "United States persons" on the basis of the citizenship of their members, but corporations only on the basis of their place of incorporation, regardless of the citizenship of stockholders. *See* Foreign Intelligence Surveillance Act of 1978 § 101(i), 50 U.S.C. § 1801(i) (Supp. V 1981); Exec. Order No. 12,333, 3 C.F.R. 200 (1982), *reprinted in* 50 U.S.C. § 401 note at 840, 846 (Supp. V 1981). The only authority the dissent cites for the proposition that shareholders may assert their own constitutional rights with regard to action taken against a corporation is the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). There, however, the only shareholder that asserted a Fifth Amendment claim arising out of the reorganization was also a creditor of one of the reorganized corporations, and the Court did not pass on which status supported the claim, *id.* at 107 n. 1, 95 S.Ct. at 341 n. 1, 117 n. 12, 95 S.Ct. at 345 n. 12; *Connecticut General Insurance Corp. v. United States Railway Ass'n,* 383 F.Supp. 510, 513 (E.D. Pa.) (lower court opinion).

\*　　\*　　\*　　\*　　\*　　\*

The dissent accuses us of not only error but apparently even of prejudgment, asserting that we have "gone to extraordinary lengths to deprive plaintiff Ramirez of an opportunity for relief," Dissent at 172,[19] and that essential portions of our

---

**18.** The cases cited by the dissent did not address claims by foreign corporations with regard to action outside the jurisdiction of the United States. *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931), involved actions taken by American officials in the United States against an alien corporation. *Porter v. United States,* 496 F.2d 583 (Ct.Cl.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), involved a claim by a corporation chartered in Micronesia with regard to a taking in Micronesia, at a time when Micronesia was a United States trust territory. Act of June 30, 1954, ch. 423, 68 Stat. 330, as amended by Act of July 19, 1962, Pub.L. No. 87–541, 76 Stat. 171, and Act of May 10, 1967, Pub.L. No. 90–16, 81 Stat. 15. *Caltex (Philippines), Inc. v. United States,* 100 F.Supp. 970 (Ct.Cl.1951), involved a claim by a corporation chartered in the Philippines, with regard to a taking in the Philippines at a time when those islands were a possession of the United States, governed as a Commonwealth pursuant to the Tydings-McDuffie Act of 1934, ch. 84, 48 Stat. 456.

**19.** This must be a serious charge, since the dissent's notion of ordinary lengths embraces alluding to factual allegations contained in, and even appending to its opinion, a letter from plaintiff Ramirez to the United States Ambassador to Honduras, written after this appeal was argued. *See* Dissent at 173 n. 80 & App. While the allegations that letter contains in no way affect our opinion, we regret the inducement to improper appellate practice which reliance upon such material entails.

analysis are "only advanced ... to make the denial of this citizen's constitutional rights more palatable," *id.* at 168. We of course reject that imputation, as we reject the dissent's more demonstrable distortions of our position. We do not, for example, maintain that "the U.S. plaintiffs should be forced to bring their claims in the foreign courts of Honduras," *id.* at 169 (though since they have been injured only in their capacity as shareholders of the other plaintiffs, the four Honduran corporations, with respect to land acquired and activities undertaken in Honduras, that would hardly seem outrageous); to the extent they have valid claims they may bring them here, but must be content with the ordinary remedy of monetary compensation—for what is, after all, a monetary injury, despite the dissent's romantic characterization of this $13 million, corporate-owned, multinational agribusiness-packery as "a U.S. citizen's private ranch," *id.* at 172. Similarly, we have not remotely said that "the foreign affairs context of Executive action can [ ] shield unlawful conduct from judicial inquiry," *id.* at 170; only that this particular foreign affairs context, plus many other factors, precludes the extraordinary remedy of injunction in this case.

The dissent invokes "the great tradition of judicial protection of individual rights against unconstitutional governmental activities," *id.* at 168. But that tradition has not come to us from La Mancha, and does not impel us to right the unrightable wrong by thrusting the sharpest of our judicial lances heedlessly and in perilous directions. It acknowledges the need to craft judicial protection in such fashion as to preserve the proper functions of government. We are therefore perplexed rather than inspired by the dissent's uncompromising pronouncement that it "do[es] not accept the proposition that a United States district court is powerless to stop a continuing violation of a U.S. citizen's constitutional rights," or "should decline for prudential considerations to intervene to arrest ongoing constitutional violations, when the alleged perpetrators are officials of the Executive Branch, amenable to process and supervision here in Washington, D.C.," *id.* at 173. Such a vision of judicial supremacy, not only in interpreting the Constitution but in controlling every aspect of Executive activity bearing upon citizens' constitutional rights, does not comport with our understanding of the separation of powers. It is a vision that obscures not merely the common-law tradition that injunction is an extraordinary remedy, but also the political truth that society has many other needs that must be accommodated with proper protection of individual rights, and the related constitutional reality that we serve beside the officers of two other coequal branches, whose responsibilities, no less important than our own, require knowledge and judgment we do not possess. If the traditional and hence limited relief we have found available in this case, based upon a more modest conception of our abilities and powers, lends itself less to stirring eulogy of the judicial role in vindicating individual liberties, we are consoled by the fact that it lends itself more to preservation of the Constitution.

For the reasons stated, the judgment of the district court is

*Affirmed.*

WILKEY, Circuit Judge, dissenting:

Plaintiff Temistocles Ramirez de Arellano, a citizen of the United States, sought to invoke the remedial powers of the federal Judiciary to halt an allegedly unconstitutional seizure and destruction of his cattle ranch by officers of the United States. Because plaintiff Ramirez sought equitable relief in the federal district court, a majority of this panel affirms the dismissal of his claim at the threshold of litigation. I cannot agree that the district court is powerless to give this citizen the relief he seeks. Accordingly, I dissent from that portion of the majority opinion which holds that the plaintiff has failed to state a claim for relief. I would remand this case to the

district court for factual development on the merits.[1]

## I. PROCEDURAL BACKGROUND

Plaintiff Ramirez and six corporate plaintiffs which he wholly owns and controls[2] brought suit in the U.S. District Court for the District of Columbia in July 1983 against Caspar W. Weinberger, Secretary of Defense, George P. Shultz, Secretary of State, and Lt. Gen. Joseph K. Bratton, Chief of Engineers for the U.S. Army Corps of Engineers. The complaint alleged that plaintiff Ramirez was the beneficial owner of a large agro-industrial complex in the northern portion of Honduras.[3] The complaint charged the named defendant officers of the United States with causing the construction and operation of a large military training camp on plaintiff Ramirez's property in Honduras.

Count I alleged that the defendants' seizure and destruction of plaintiffs' property was unconstitutional as unauthorized by any U.S. law or the Constitution. Count II charged the defendants with depriving the plaintiffs of the use and enjoyment of their property without due process of law.[4] The plaintiffs requested declaratory and injunctive relief. In particular, plaintiff Ramirez requested a declaration that the defendants' actions were unconstitutional as unauthorized by law and that they violated due process of law. He also requested an injunction against the unlawful use of his property by the named defendants.[5]

The defendant officials promptly moved to dismiss the complaint on the grounds that the action presented a nonjusticiable political question and that plaintiffs had failed to state a claim for relief. The district court granted the dismissal, holding that the case involved a nonjusticiable political question.[6] Plaintiffs appealed to this court.

## II. JURISDICTION

Despite any political or diplomatic overtones to the defendants' actions giving rise to the plaintiffs' claims, the district court had the power and the duty to assume jurisdiction under Article III. The jurisdictional power of the federal courts to resolve disputes challenging the constitutional authority of a coordinate branch of government is not lost merely because of a suit's political context.[7] Nor do the foreign relations implications of disputes over the propriety of Executive actions deprive the federal Judiciary of jurisdictional power under Article III.[8] Plaintiff Ramirez's claim that the named federal officers have unconstitutionally deprived him of his property is a paradigmatic case for resolution by the federal Judiciary. Thus, I concur with my colleagues' holding that the district court improperly dismissed this claim for lack of jurisdiction. Plaintiff Ramirez has rightly invoked the jurisdiction of the federal courts.[9]

---

**1.** I agree with the holding in Part II of the majority opinion. Plaintiffs' claim does not present a nonjusticiable political question.

**2.** Two of the six corporations are U.S. nationals (Puerto Rican) and four are Honduran. Together they form a chain of title through which plaintiff Ramirez owns the property. Complaint ¶ 5.

**3.** Complaint ¶¶ 9–11, 15–19.

**4.** The third count charges the defendants with violating the Law of Nations and is brought under the Alien Tort Claims Act, 28 U.S.C. § 1350 (1976 & Supp. V 1981).

**5.** Complaint at 9–10. The complaint also prays for such other relief as the court deems just.

**6.** Memorandum Opinion (D.D.C. 24 Aug. 1983).

**7.** *See Immigration & Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983).

**8.** *See Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706–707, 7 L.Ed.2d 663 (1962).

**9.** The majority intimates, but does not hold, that because plaintiff Ramirez, an American citizen, and his two wholly owned U.S. corporations own and control the property in question by means of wholly owned Honduran corporations, the three U.S. plaintiffs are deprived of constitutional rights against the alleged seizure of their property and businesses by the U.S. defendants. This particular suggestion that the U.S. plaintiffs have no right to sue for the alleged seizure was not raised, argued, or briefed by any of the parties to this litigation, either before the district court or at this court

### III. THE PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF

#### A. *Standards for Dismissal*

Plaintiff Ramirez has stated a claim for relief sufficient to withstand a motion under Rule 12(b)(6), Fed.R.Civ.Proc., to dismiss for failure to state a claim for relief. That is all that is now at issue. The standards for assessing the propriety of dismissal require the court to accept as true all material allegations of the complaint and to construe the complaint in favor of the plaintiffs.[10] Dismissal for failure to state a claim for relief is proper only when "it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief."[11] All doubts must be resolved and all inferences made in favor of the plaintiffs in assessing the sufficiency of the complaint.[12] In order to affirm the district court's dismissal, therefore, this court must find beyond doubt that there is no set of facts favorable to the plaintiffs and suggested by the complaint for which any form of relief would be proper in the district court.

When a district court improperly relies on factual materials outside the complaint and construes those materials in favor of the defendants on a motion to dismiss, the task

on appeal. The majority's gratuitous suggestion that the U.S. plaintiffs may lack standing need not detain us, as it did not prevent the majority from proceeding to decide the merits of the U.S. plaintiffs' claims.

The defendants' lack of interest in this standing issue is readily explained by the fact that the U.S. plaintiffs clearly have alleged direct and substantial injury to legally cognizable interests as a result of the defendants' claimed conduct. First, plaintiff Ramirez and his two wholly owned U.S. corporations have alleged that the defendants' unconstitutional seizure has effected the near destruction of their wholly owned businesses in Honduras. These three U.S. plaintiffs are the sole owners of the businesses and as such can sue the U.S. defendants for the alleged unconstitutional destruction of their corporate holdings. Second, the U.S. plaintiffs also have a legally protected interest in the real property allegedly seized by the U.S. defendants. Their status as sole and ultimate shareholders of the corporations which have title to the land gives rise to a property interest in the U.S. plaintiffs that is protected from unconstitutional activity of the type alleged here. In *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 117, 95 S.Ct. 335, 345, 42 L.Ed.2d 320 (1974), not a single Justice dissented from the Court's finding that the sole shareholder of Penn Central Transportation Co. had sufficient interest to be a proper party in a challenge to an alleged taking of the railroad company's property without just compensation. The corporate form of ownership of the land does not deprive the U.S. plaintiffs here of their right to sue in this case.

Furthermore, it is settled law that U.S. citizens have rights against the unconstitutional taking by federal officers of their real and personal property even when that property is located in a foreign country. *See, e.g., Seery v. United States,* 127 F.Supp. 601, 130 Ct.Cl. 481 (1955) (U.S. citizen had constitutional protection when her real and personal property in Austria was seized for use as a U.S. officers'

club.). The mere fact of incorporation abroad does not deprive the U.S. plaintiffs of a protected property interest for the purposes of this suit.

Furthermore, the alien Honduran corporations named as plaintiffs may be entitled to assert claims of unconstitutional seizure on their own behalf, irrespective of ownership by a U.S. citizen. *See, e.g., United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931); *Porter v. United States,* 496 F.2d 583, 591, 204 Ct.Cl. 355 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *cf. Turney v. United States,* 115 F.Supp. 457, 464, 126 Ct.Cl. 202 (1953).

For decades American investors abroad have been utilizing the privilege of incorporation in the host country in order to put themselves in parity with indigenous corporations and other foreign investors (French, Japanese, etc.) in regard to taxation, labor law, and other matters. It has hitherto never been suggested that the constitutional rights of American citizen investors, in this case against unconstitutional seizures by U.S. officials, were in any way lessened by the mere utilization of such corporate vehicles. The majority's implication that this is not true will send shudders through the corporate counsel's office at many a multinational corporation.

10. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Shear v. National Rifle Ass'n of America,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

11. *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)) (emphasis added).

12. *Shear v. National Rifle Ass'n of America,* 606 F.2d 1251, 1253 (D.C.Cir.1979); *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979).

of the appellate court is to review and correct the error, not to join in the improper factual foray. Instead, the majority has pored through the voluminous materials submitted by plaintiff Ramirez in his effort to show the existence of genuine issues requiring litigation and in conjunction with other judicial proceedings not now on appeal, and it has "found evidence" to fell plaintiffs' well-pleaded complaint. These materials submitted by plaintiff Ramirez, including newspaper articles and statements by employees and observers, comprise neither stipulations of fact nor admissions by the plaintiffs. Use of these materials to dismiss the complaint under Rule 12(b)(6) deprives the plaintiffs of the procedural and substantive rights that would attend their case if the dismissal had been properly treated as a motion for summary judgment. The District Court's statement, however, that "there are some essential disputes as to the material facts in the case" makes it difficult, if not impossible, for this court to search for and find a legal ground for summary judgment.[13]

More importantly, however, even if it were proper to utilize specific factual materials outside of the pleadings to justify a dismissal for failure to state a claim, all doubts must be resolved and all inferences and interpretations of those materials must be made in favor of the plaintiffs. Not only has the majority relied on specific materials outside the complaint to support dismissal, but it has interpreted those items strongly in favor of the defendants. By an incredible misunderstanding of dismissal under Rule 12(b)(6), the majority seems to think that the particular source of the factual materials permits those materials to be used against the plaintiffs. It is, however, not the *source* of the materials, but the *slant* of the inferences permitted to be drawn which is crucial to the propriety of dismissal for failure to state a claim for relief. The majority has improperly slanted the factual statements toward the defendants, drawing inferences from some items against the plaintiffs and ignoring other factual allegations that support the plaintiffs' claim.

Only speculation favorable to the defendants allows the conclusion that Honduran troops are now participating in and supervising the training activity at all, let alone to such an extent that equitable relief against the U.S. defendants would necessarily thwart Honduran troop movements.[14] Fact-finding in favor of defendants permits the conclusion that relocating the camp

**13.** Fed.R.Civ.P. 12 states that if on a 12(b)(6) motion to dismiss,

> matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In addition, U.S. District Court Rules, D.C., provide that on each motion for summary judgment, the movant must file a statement of the material facts and the opposing party shall then file "a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Rule 1–9(h). Plaintiffs were not afforded these procedural rights. Furthermore, as a substantive matter, summary judgment is improper here. As the District Court stated:

> Summary judgment is a technique to resolve disputes as a matter of law when there is no dispute as to a material fact, and it is quite obvious here ... that there are some essential disputes as to the material facts in the case.

Transcript of 26 July 1983, at 11.

**14.** The factual materials submitted by the plaintiffs in their effort to show that material issues are in dispute reveal that the nature of participation by Honduran troops, if any, is uncertain. While some declarations indicate that Honduran troops, may, on occasion, have escorted or accompanied the American forces onto the plaintiffs' land, others assert that Honduran troops were not involved in the U.S. excursions onto the plaintiffs' property.

> [A]ll the reconnaissance for the training areas outside the designated area of the Silin section was by the Green Berets.

Declaration of Mr. Dennis J. Bobilya, filed 25 July 1983, at 2–3.

> Many of my employees and guests have told me ... that American soldiers have been surveying and measuring throughout the Los Presos and Taya Crique Sections of my ranch and that they were *not* accompanied by Honduran National soldiers ....

Supplemental declaration of Mr. Ramirez, filed 25 July 1983, at 2–3.

would impinge upon Honduran actions, since plaintiffs averred that Honduran officials actually want the U.S. to move the training center.[15] Mere conjecture supportive of defendants underlies the contention that the complaint must fail because of the certain inability of the district court to assess the harm to defendants from all forms of equitable relief. Doubts are resolved against the plaintiffs by a factual conclusion that relocating the camp to public property or confining its operations to a particular acreage would cause great hardship to the public interest. And the majority's conclusion that all forms of equitable relief would pose hopeless compliance and supervision problems for the district court resolves contested and unproved factual issues squarely against the plaintiffs.

While I take no view on the weight or substance of the plaintiffs' factual case as it might be developed, I am deeply disturbed by the unique mode of analysis that is used to dismiss the plaintiffs' complaint under Rule 12(b)(6). It is nothing other than improper fact-finding of controverted material issues by an appellate court on review of a district court's dismissal for lack of jurisdiction. As such, it visits great unfairness on these plaintiffs by depriving them of the substantive and procedural rights to which they are entitled when they bring an action in the federal courts.[16]

If instead the proper standards for dismissal are applied to this case, it is clear that dismissal of the plaintiffs' case is not appropriate at this time. Plaintiff Ramirez's complaint indicates that he may be able to prove a set of facts which would entitle him to relief.

### B. *The Plaintiffs' Set of Facts*

The set of facts alleged by plaintiff Ramirez in his complaint and other sworn documents filed with the court gives rise to causes of action for which the district court could properly give relief. Assuming, as we must, the truth of the plaintiffs' material allegations for the purposes of this appeal, the facts are as follows.

Plaintiff Ramirez, a United States citizen, is the beneficial owner, general manager, and chief executive of a large agricultural-industrial complex in the northern region of Honduras. Plaintiff Ramirez is a businessman, a founding member of the Lion's Club of Trujillo, Honduras and the founder of the Association for the Defense of the Free Enterprise System in San Juan, Puerto Rico. Plaintiff Ramirez has engaged in numerous civic and community services in Puerto Rico and in Central America, including assisting the U.S. government in a meat distribution program for Puerto Rico. Since acquiring his Honduran property over 20 years ago, plaintiff Ramirez has developed his land from a raw jungle into a 14,000 acre cattle ranch, meat-packing operation and shrimp-packing plant, employing up to 500 workers. The value of the plaintiffs' investment in the Honduran property is over $13,000,000.[17]

Still assuming the veracity of plaintiffs' factual declarations, the plaintiffs' property came to be seized by the defendants in the following way. In March 1983 the U.S. Department of Defense decided to establish a Regional Military Training Center to train soldiers from the army of El Salvador. Due to congressional unwillingness to increase the number of military advisers in El Salvador itself, the Department of Defense

---

**15.** Plaintiff Ramirez averred:

The Honduran Armed Forces would move the RMTC, in whole or in part, off my ranch if the United States so requested. One such official explained: "The United States is a strong country, Honduras is weak. What the United States wants, it gets."

Supplemental Declaration of Mr. Ramirez, filed 25 July 1983, at 4. And furthermore, plaintiffs have averred that the Hondurans view the dispute as a U.S. problem, not a Honduran one. *Id.*

**16.** Plaintiffs are, for example, prevented from proving that equitable relief would not have an impact on Honduran actions nor impugn Honduran law, that relocation of the camp could be smoothly effected, or that fencing or other barriers could prevent compliance problems from arising if the district court considered ordering particular forms of equitable relief.

**17.** Complaint ¶¶ 4–9; Declaration of Mr. Ramirez, filed 13 July 1983, ¶¶ 1–5.

determined that it must locate the training center elsewhere.[18] After considering several possible countries for the location of the military camp, the Defense Department selected Honduras. Newspapers in the United States reported at that time that the Honduran government resisted the Defense Department's choice of Honduras for the military camp and that a U.S. Army spokesman had stated that Honduras did not have anywhere to locate the training center.[19] In April of 1983, however, officials of the U.S. Department of Defense proceeded to select a specific site in Honduras for the military training camp, which was plaintiffs' property.[20] Officers of the Army Corps of Engineers began planning for the construction of a 1,000 man tent camp and training facility at the chosen site.[21]

Again assuming the truthfulness of plaintiff Ramirez's declarations, in May of 1983 Ramirez discovered that the intended site for the military training camp was on his land and immediately so informed officials at the United States Embassy. Construction of the military camp proceeded nonetheless. U.S. military personnel simply moved in, with the result that the majority of the ranch's 14,000 acres and 90% of its grazing land is being used as a military training camp. The defendants caused the construction of a 1,000-man tent camp, an unspecified number of buildings, an ammunition storage facility, and a firing range on plaintiffs' ranch. Over 100 U.S. Army Special Forces Soldiers are presently training over 1,000 soldiers on plaintiffs' property, using live ammunition. Plaintiffs' prime grazing land and fences have been bulldozed, the flow of water to the meat-packing plant has been interrupted, and cattle have been shot by stray bullets. Ranch employees, fearing for their lives, have refused to tend cattle near the military activities and the cattle have become undernourished.[22]

No compensation has been paid to the plaintiffs, nor any hearing held. Neither the Honduran nor the U.S. government has conducted eminent domain proceedings with respect to any of the plaintiffs' property.[23] Plaintiff Ramirez's personal efforts to resolve this dispute with officials at the Departments of State and Defense were unproductive or rebuffed.[24]

The plaintiffs' declarations assert numerous injuries as a result of the defendants' alleged unlawful conduct, injuries which we assume to be real for the purposes of this appeal. Plaintiff Ramirez has been deprived of the use and enjoyment of his property and is threatened with the loss and destruction of his land, his business, and his investment. Cattle are being lost; ranching activities are suspended due to hazardous working conditions; and the meat-packing operation is threatened with collapse because of a diminished flow of full-weight cattle to the plant. Furthermore, plaintiff Ramirez, his family, and employees are frightened and intimidated by the military

---

18. *See* Plaintiffs' Memorandum of Points and Authorities, filed 13 July 1983, Attachment # 1, The Boston Globe, 27 March 1983, p. 1; *id.,* Attachment # 3, The Miami Herald, 12 April 1983, p. 17–A.

19. *See id.,* Attachment # 3, The Miami Herald, 12 April 1983, p. 17–A ("Honduras balks at hosting Salvador army training"); *id.,* Attachment # 2, N.Y. Times, 20 March 1983, p. A–19.

20. Declaration of Mr. Ramirez, filed 13 July 1983, ¶¶ 24, 31.

21. *Id.*

22. Complaint ¶ 11; Third Supplemental Declaration of Mr. Ramirez, filed 7 Sept. 1983, ¶¶ 3–7.

23. The majority opinion states that Honduran officials discussed eminent domain proceedings with plaintiff Ramirez. This discussion with Honduran military and U.S. officials, plaintiff Ramirez alleges, only pertained to a specific 1,500–2,000 acre section of his ranch known as the "Designated Area." Complaint ¶ 11; Declaration of Mr. Ramirez, filed 13 July 1983, ¶¶ 13, 18. It did not result in the initiation by the Honduran government of any lawful expropriation proceedings. Complaint ¶ 11.

24. Declaration of Mr. Ramirez, filed 13 July 1983, ¶ 36.

training activities taking place on the ranch. In addition they have become potential targets for anti-American, anti-Salvadoran terrorist retaliation due to the defendants' conduct on plaintiff Ramirez's property, which conduct has prompted reports in the Honduran press that plaintiff Ramirez is personally sponsoring the U.S. Regional Military Training Camp.[25]

## C. The Plaintiffs' Claims

This set of facts outlined in the complaint and declared by the plaintiffs in sworn documents filed with the court gives rise to causes of action against the named defendants sufficient to withstand dismissal for failure to state a claim. Count I of the plaintiffs' complaint charges that the actions of the defendants in locating and operating the Regional Military Training Camp on plaintiffs' land, in seizing and destroying the plaintiffs' property, and in depriving the plaintiffs of the use and enjoyment of their property "are beyond defendants' express or implied authority under the laws and treaties of the United States and the United States Constitution."[26] Plaintiffs do not challenge the defendants' actions merely because no compensation has been paid; plaintiffs challenge the constitutional power of the Executive officials named as defendants to seize private property under the circumstances presented by this case.

It is settled law that Executive power to take private property must stem from an act of Congress or from the Constitution itself.[27] When no act of Congress or provision of the Constitution expressly or implicitly authorizes the Executive to take private property, a taking of private property by the Executive is unconstitutional as a usurpation of Congress's lawmaking and appropriation powers. A leading authority supporting a cause of action in plaintiffs' first count is *Youngstown Sheet & Tube Co. v. Sawyer*,[28] in which the Supreme Court adjudicated a challenge to the Executive's power to seize the plaintiffs' steel mills during the Korean War. Holding that the President's action was unconstitutional because it was not authorized by an act of Congress or the Constitution, the Court upheld a federal district court's injunction prohibiting Executive officers from seizing the plaintiffs' property.[29]

Count I of plaintiff Ramirez's complaint properly asks the district court to decide if the federal defendants here were acting outside of their lawful powers when they allegedly seized plaintiffs' ranch. While I express no view on the merits of the first count, plaintiff Ramirez has succeeded in stating a claim against the defendants for an unauthorized, unconstitutional deprivation of the use and enjoyment of his property. This claim is adjudicable in the federal district court.

Count II contends that the defendants' failure to provide the plaintiffs with prior notice and a hearing has unlawfully deprived the plaintiffs of the use and enjoyment of their property without due process

---

**25.** Declaration of Mr. Ramirez, filed 13 July 1983, ¶ 33; *id.,* Attachment # 3, El Heraldo, 13 June 1983, p. 3.

**26.** *See* Complaint ¶ 16. The majority misconstrues this claim as one for just compensation for a taking. By so characterizing the claim, the majority concludes that the only relief available to the plaintiffs is in the Claims Court. But plaintiffs' Count I charges that the defendants' seizure of property is unconstitutional because it is beyond the authority of the defendants under U.S. laws and the U.S. Constitution, not simply because no compensation has been paid. Such a claim may not fall within the jurisdiction of the Claims Court. *See infra* at pp. 164–166.

**27.** *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Hooe v. United States,* 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910); *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

**28.** 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

**29.** *Id.* Similarly in *The Paquete Habana,* 175 U.S. 677, 710–11, 20 S.Ct. 290, 303, 44 L.Ed. 320 (1900), the Supreme Court held that the wartime capture of foreign fishing vessels off the coast of Cuba by U.S. officials was unlawful because such seizures had not been authorized by Congress.

of law in violation of the Fifth Amendment. It similarly states a claim adjudicable in the federal district court for violation of the plaintiffs' right to due process of law.[30]

### D. Relief is Not Barred in the District Court

If the plaintiffs prevail on their stated claims, the district court could properly award relief for the defendants' unlawful conduct. Even if damages against the U.S. government are not available in the district court,[31] the court would not abuse its equitable discretion by awarding some form of injunctive or declaratory relief. Plaintiffs' complaint states a claim for which relief can be granted.

A trial court's equitable remedial powers have great breadth and flexibility.[32] As the Supreme Court has stated, "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow."[33] The nature of the proved violation sets the parameters of the trial court's discretion to order equitable relief; the duty of the court is to decree relief that corrects the condition offending the Constitution or U.S. laws.[34]

In exercising its broad equitable powers, a trial court balances the nature of the violation against the affected public and private interests to determine whether some form of equitable relief is an appropriate remedy for unlawful conduct. The propriety of a particular equitable order, therefore, must turn on the type of violation proved, the specific injuries suffered by the plaintiff, and the nature of the interests of the defendants and the public which would be affected by a particular form of equitable relief.[35] Taking, as we must, a favorable view of the plaintiffs' complaint, it is error to conclude that plaintiff Ramirez is unable, beyond doubt, to prove a set of facts entitling him to equitable relief.[36]

The particulars of the doctrine of equitable discretion support reversal of the district court's dismissal. An equitable remedy is proper when the plaintiff lacks an adequate remedy at law and when a balancing of the rights and interests involved as well as other prudential considerations permit injunctive or declaratory relief.[37]

30. Plaintiffs principally rely on cases which require advance notice and a hearing prior to some deprivations of property rights. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Mullane v. Central Hanover Bank & Trust, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

31. The Claims Court has exclusive jurisdiction over claims for monetary relief in excess of $10,000, brought under the Tucker Act. See 28 U.S.C. §§ 1346, 1491 (1976 & Supp. V 1981). The claims stated here, however, may not fall within the jurisdiction of the Claims Court. See infra at pp. 164–166.

32. See, e.g., Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Courts are, of course, more reluctant to utilize their equitable powers for interim orders—when the plaintiffs have not yet proved their claims—than they are to grant equitable remedies for the correction of proved unlawful conduct. See, for example, Adams v. Vance, 570 F.2d 950 (D.C.Cir.1978), cited by the majority at 148, in which the court required the plaintiffs to make an extraordinarily strong showing in order to justify a highly intrusive preliminary injunction against the Executive, when no constitutional violation had yet been proved.

33. Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973).

34. See Swann v. Board of Education, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–1276, 28 L.Ed.2d 554 (1971).

35. See Hecht Co. v. Bowles, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944) (A court of equity has flexibility to mold decrees to the particulars of each case.).

36. The majority's conclusion that all forms of equitable relief would either terminate the Regional Military Training Camp or move it to adjacent public lands assumes facts neither stated nor implicit in the plaintiffs' complaint. The court might, for example, under a certain set of proved facts, confine the defendants' activities to that portion of the ranch known as the "Designated Area." See supra note 23. Or it might require the defendants to use nonadjacent public property for the camp or issue an order in the alternative, giving the defendants options for compliance.

37. See Developments in the Law: Injunctions, 78 Harv.L.Rev. 996–1054 (1965); cf. Restatement (Second) of Torts § 936 (1977).

Plaintiffs' complaint shows that their stated claims are irremediable at law and that a balancing of the equities favors relief.

### 1. Adequacy of the Remedy at Law

If the district court determined that the actions of the federal defendants were unlawful as unauthorized by an act of Congress or the Constitution, the allegations in plaintiff Ramirez's complaint suggest that monetary relief for the present continuing occupation and effective seizure of the plaintiffs' property would be either unavailable or inadequate.

### a. The Claims Court May Lack Jurisdiction to Award Compensation

Equitable relief cannot be denied on the ground that monetary relief for the violations alleged here is properly available in the Claims Court. Plaintiffs challenge the authority of the defendants to take their property; they do not challenge the seizure because just compensation has not been paid. The complaint suggests that the Tucker Act might not permit recovery against public funds for the unconstitutional seizure alleged here, due to lack of authority for the defendants' actions.

Monetary relief for unauthorized Executive seizures is not available in the Claims Court. The Supreme Court recently reaffirmed this principle in *Regional Rail Reorganization Act Cases:*

> "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government," and hence recovery is not available in the Court of Claims.[38]

Likewise, in *Hooe v. United States,* the Supreme Court held that the Court of Claims did not have jurisdiction to award damages for the unauthorized seizure of the plaintiffs' basement by U.S. officers. Justice Harlan, writing for the Court, rejected the plaintiffs' argument that they were entitled to just compensation for a taking in the Court of Claims. He concluded that because the officers acted without legal or constitutional authority their actions did not create a claim against the government for relief in the Court of Claims.[39] And in *United States v. North American Transportation & Trading Co.,* Justice Brandeis held for the Court that the actions of a federal official who took land for military purposes were unauthorized and therefore created no liability for compensation by the government in the Court of Claims.[40] This limitation on the jurisdictional reach of the Claims Court is settled law.[41]

Whether an action of Executive officials is sufficiently authorized by congressional or constitutional provision to permit a claim for relief under the Tucker Act depends upon the nature of the facts of the particular case and the scope of the defendants' lawful powers. Not all lawless acts of government officials are considered unauthorized for the purpose of determining the government's liability to pay compensation under the Tucker Act. The question in each case is whether the defendants' actions are substantially in compliance with the powers granted to them by congressional statute or constitutional provision. Recovery under the Tucker Act has been permitted when a taking by an officer is the natural consequence of congressionally approved measures or the result of an exercise of discretion granted to an official for the implementation of a congressional statute. For example, in *United States v. Causby,* the Supreme Court held that a Tucker Act claim had been stated when the Civil Aeronautics Board, acting within the scope of

---

**38.** 419 U.S. 102, 127, n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974) (quoting *Hooe v. United States,* 218 U.S. 322, 336, 31 S.Ct. 85, 89, 54 L.Ed. 1055 (1910)).

**39.** 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910).

**40.** 253 U.S. 330, 334, 40 S.Ct. 518, 520, 64 L.Ed. 935 (1920).

**41.** *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952); sources cited *supra* note 38; *cf. The Paquete Habana,* 175 U.S. 677, 710–11, 20 S.Ct. 290, 303, 44 L.Ed. 320 (1900).

authority granted to it by Congress, prescribed an air traffic route that was found to result in the taking of an easement over the plaintiff's land.[42] Although Congress itself had not expressly put that particular airspace into the public domain, the taking was held to be authorized by Congress because it was within the discretion of the Civil Aeronautics Board, under the congressional statute, to prescribe an air traffic route like the one at issue. *Portsmouth Harbor Land & Hotel Co. v. United States* also supports this principle.[43] In that case the Court discussed the question of authority when it held that the firing of cannonballs over the plaintiff's property was a sufficient injury to give rise to a claim for compensation. The Court stated that because the military officials were authorized to build the fort in question and to staff it with guns and men, it would be reluctant to find lack of authority for the firing of the guns which resulted in the property damage. Nonetheless, it remanded the case to the Court of Claims for a determination whether there was in fact sufficient authority on the part of the military officials so to fire the guns to bind the government to pay for the property taken. A determination of the defendants' authority by the Court on appeal of a dismissal for failure to state a claim was considered improper in that case.

When an officer acts wholly outside the scope of the powers granted to him by statute or constitutional provision, the official's actions are considered unauthorized for the purposes of a Tucker Act remedy. The Tucker Act has been consistently held not to permit monetary recovery against the government when the defendants' actions are not in substantial compliance with

the congressional grant or the natural consequences of a congressional mandate.[44] As the Claims Court has reiterated on many occasions, Congress did not, in passing the Tucker Act, deprive itself of control over the government's obligation to use public funds to pay for seizures and takings of private property by government officials.[45] Such an interpretation of the Tucker Act is required by the constitutional grants of appropriation and lawmaking powers to Congress [46] and the congressional desire not to permit individual officers to drain the U.S. Treasury by their unauthorized acts.

The limits to recovery under the Tucker Act for unauthorized seizures are aptly illustrated by the recent case of *Southern California Financial Corporation v. United States.*[47] In that case officers of the U.S. Air Force used approximately 120 acres of the plaintiff's land as a buffer-zone for an Air Force base's ammunition dump and bomb storage area. An appellate panel of the Court of Claims found that the defendant Air Force officials were not authorized, explicitly or implicitly, to take the plaintiff's property and that therefore the plaintiff could not invoke the jurisdiction of the Claims Court. In denying the plaintiff's claim for monetary relief on the ground that the military officials' taking of the plaintiff's property was unauthorized and that therefore a Tucker Act remedy did not lie, the unanimous appellate panel of the Court of Claims stated:

> Ordinarily, whenever there is no authority for a taking or intrusion, the claimant, although unable to obtain compensation, can seek an injunction or a declaratory judgment against the unauthorized gov-

---

**42.** 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).

**43.** 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922). *See also United States v. Lynah,* 118 U.S. 445, 465, 23 S.Ct. 349, 355, 47 L.Ed. 539 (1903) (If what the officers of the government did, acting under the direction of the government, results in expropriation, it is authorized for the purposes of the Tucker Act.).

**44.** *See* sources cited *supra* notes 38–41.

**45.** *See Southern California Financial Corp. v. United States,* 634 F.2d 521 (Ct.Cl.1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981); *NBH Land Co. v. United States,* 576 F.2d 317, 217 Ct.Cl. 41 (1978).

**46.** *See* U.S. Const. art. I, § 1; *id.,* § 9, cl. 7.

**47.** 634 F.2d 521 (Ct.Cl.1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981).

ernmental activities.[48] (per Judge Oscar H. Davis)

The dismissal of plaintiff Ramirez's complaint is not sustainable on the ground that the U.S. plaintiffs can obtain relief under the Tucker Act. Whether or not a Tucker Act claim can lie depends upon facts not yet ascertained and the nature of the congressional and constitutional grants of power to these defendants to make military acquisitions, which has not yet been briefed or argued. The defendants' allegedly unauthorized destruction of plaintiffs' $13 million investment may not be in substantial compliance with the defendants' lawful powers, and it is impossible for this court at this stage of the case to determine that it is. Nor may Congress have intended so to tax the public coffers for such unauthorized activities under the Tucker Act.[49] Given

that the availability of a Tucker Act remedy is intertwined with the merits of the plaintiffs' case, which have not been briefed or argued on appeal of this dismissal, a denial of equitable relief is not sustainable on the ground that damages are properly available in the Claims Court. This holding of the majority impermissibly decides the merits of the plaintiffs' case on review of a dismissal for lack of jurisdiction, which is an abuse of appellate discretion.[50] The majority's holding that the alleged violations are within the scope of the defendants' authority for the purpose of a Tucker Act remedy, however, must be considered *res judicata* in the Claims Court.

### b. Monetary Relief is Inadequate

Even if monetary relief were properly available under the Tucker Act in the

---

**48.** 634 F.2d at 526 n. 8.

**49.** Congress has provided that acquisition of private property is beyond the authority of military officials unless it is expressly permitted by law.

> No military department may acquire real property not owned by the United States unless the acquisition is expressly authorized by law.

10 U.S.C. § 2676 (1982).

The defendants in this case have not cited a single congressional act that expressly authorizes the military acquisition allegedly made on plaintiffs' land by the U.S. military officers named as defendants. It is unclear at this stage of the proceedings whether any of the statutory grants of authority to the military to acquire property would properly authorize the taking in this case. Particular military construction projects may be expressly authorized by means of the annual Military Construction Authorization Acts passed by Congress after requests and recommendations by the military departments. *See* 10 U.S.C. §§ 2801–03, 2859, 2861 (1982). In addition, the Secretary of a military department is expressly authorized to acquire any interest in land that "does not cost more than $100,000." 10 U.S.C. § 2672 (1982). The Secretary is also expressly authorized to acquire leaseholds of specified duration and specified maximum rents in foreign countries. 10 U.S.C. § 2675 (1982). Whether the military project alleged here is authorized by those or other provisions of law depends upon the value of the property taken, the nature of the interest acquired (e.g., leasehold or fee simple) and other facts not yet ascertained. It might turn out that the magnitude of the military project alleged by plaintiffs is not in substantial compli-

ance with the defendants' legal authority to acquire private property. If so, a claim for damages under the Tucker Act would not lie.

The majority argues that these statutory provisions requiring specific authorization for military acquisitions do not govern inverse condemnations by the military. Congress did *not*, however, intend to deprive itself of control over military expropriations whenever military officials act by inverse condemnation instead of by eminent domain or contract. Although military officials' failure to follow certain procedural requirements set forth in the statutes may not defeat a Tucker Act claim for compensation in some inverse condemnation cases, the officials' actions still must be in substantial compliance with their legal authority to take private property in order for a Tucker Act remedy to be proper. For example, in *Armijo v. United States,* 663 F.2d 90 (Ct.Cl.1981), the Court of Claims held that the defendants' failure to follow certain advance reporting requirements of 10 U.S.C. § 2662 did not render the defendants' actions unauthorized for the purposes of a Tucker Act claim, when the plaintiffs' property was taken by inverse condemnation. It held that Congress did not intend so to deprive those plaintiffs of compensation, provided, however, that the inverse condemnation was "*otherwise authorized.*" *Id.* at 96 (emphasis added). Defendants have not directed our attention to any legal provision which authorizes the inverse condemnation claimed here.

**50.** *See Singleton v. Wulff,* 428 U.S. 106, 119–21, 96 S.Ct. 2868, 2876 (1976) (court of appeals abused its discretion by deciding the merits on review of a district court's dismissal for lack of jurisdiction).

Claims Court, the district court could reasonably find, on the basis of the facts alleged by plaintiff Ramirez, that damages would not be an adequate remedy for the allegedly unauthorized and unconstitutional seizure of the plaintiffs' property. The violation alleged here is not that the failure to pay just compensation has rendered the defendants' actions unlawful; plaintiffs challenge the legal authority of the defendants to expropriate their property. A remedial determination whether monetary relief can adequately compensate plaintiffs for a claimed unconstitutional seizure of private property by unauthorized government officials is unrelated to the government's power lawfully to expropriate property for just compensation. The Fifth Amendment's requirement of just compensation for a taking defines the government's lawful powers of eminent domain; it does not embody a remedial principle that monetary damages are fully adequate to redress unconstitutional activity by unauthorized government officials injuring private property.[51] The court must use general remedial principles to determine whether monetary damages could adequately compensate the plaintiffs for the constitutional violations alleged here.[52]

Plaintiffs' alleged injuries cannot be declared adequately remediable at law on review of this dismissal. The constitutional violations here allegedly involved the seizure of plaintiffs' land, the threatened destruction of the plaintiffs' agro-industrial complex, and an increased risk to the personal safety of plaintiff Ramirez and his family. These types of injuries are immeasurable in monetary terms and are classically found to be irremediable at law. Equity will not hesitate to enjoin an unconstitutional taking and even a repeated trespass or other nuisance to land.[53] Nor can this court conclude that plaintiff Ramirez's threatened loss of his long-standing business enterprise is compensable by damages. Judge Friendly, in granting equitable relief for a similar type of injury to a plaintiff's livelihood, noted that the plaintiff wanted to run his business, not to retire on a damages award.[54] Finally, the increased risk to plaintiff Ramirez's personal safety allegedly due to defendants' unconstitutional conduct would not be remediable by damages. Plaintiff Ramirez has claimed that the unconstitutional, unauthorized acts of the defendants make him a target for terrorist retaliation and are a hazard to the personal safety of his family and of workers at the ranch. Life-threatening conditions and loss of personal security created by constitutional violations are not redressed by payments of money.[55] The district court could prop-

---

51. Similarly, *Stringer v. United States,* 471 F.2d 381 (5th Cir.1973) *cert. denied,* 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973), cited by the majority at 154, merely holds that the Tucker Act's cause of action for compensation when the United States takes property pursuant to its lawful powers of eminent domain defeats a due process claim. It does *not* address the question posed here whether a Tucker Act remedy is available and can defeat a claim when the facts show that a case does *not* involve the officials' utilization of authorized eminent domain powers.

52. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 595–96, 72 S.Ct. 863, 889–890, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

53. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Erhardt v. Boaro,* 113 U.S. 537, 5 S.Ct. 560, 28 L.Ed. 1113 (1885); *Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries v. Geoghegan,* 281 F.Supp. 116 (D.D.

C.1967); 6A J. SACKMAN, NICHOLS' THE LAW OF EMINENT DOMAIN § 28.3 (3rd ed. 1981).

54. *See Semmes Motors Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970) (Judge Friendly affirmed an injunction because damages could not compensate the owners for the loss of their 20-year-old business.).

55. The majority ignores the threat to plaintiff Ramirez's personal safety by stating that the former owner of land taken by the government is not entitled to retain possession. Maj. op. n. 13. The majority's application of that principle to this case is astonishing, given the fact that the U.S. defendants have repudiated any property interests in plaintiffs' land. They have expressly stated that this dispute is *not* an attempt to acquire the plaintiffs' property in the name of the United States. *See* Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, filed 20 July 1983 at 17 n. **. Under such circumstances, when the U.S. defendants have repudiated ownership

erly find that any remedy at law would be inadequate to correct the violations alleged here.

I find it difficult to believe that an American citizen would be banished to a damages remedy in the Claims Court if he were the victim of an ongoing violation of his constitutional rights within the United States. The argument that the plaintiffs really belong in the Claims Court is not a valid argument on its own merits. It is an argument which is only advanced by the majority to make the denial of this citizen's constitutional rights more palatable. Plaintiff Ramirez has a right to be in the district court, where he has a right to ask for injunctive and declaratory relief as well as damages against the individual, named defendants if he so desires.

### 2. Balancing the Equities and Prudential Considerations

Not only could the district court conclude that monetary relief would be inadequate under facts consistent with the complaint, but the court might also properly find that a balancing of the equities favors relief. Plaintiffs' complaint states claims for which equitable relief cannot be declared improper on a balancing of the equities and prudential considerations.

Assuming that the plaintiffs could prevail on the merits of their claims, the equities favoring relief are quite powerful. Plaintiff Ramirez claims an unconstitutional intrusion into his private property by military officers of the United States, threatening the loss of his land, his 20-year-old investment, and his labors. Plaintiffs' case is not a routine trespass action or a piddling boundary dispute; it is a claim for relief from a deprivation of land, business, and

personal safety caused by an *unconstitutional* invasion by officers of the United States. These claims for relief from unlawful military excesses invoke the great tradition of judicial protection of individual rights against unconstitutional governmental activities. The federal Judiciary has not hesitated to grant equitable relief to individuals suffering similar injury both at home and abroad due to constitutional violations by government officials.[56] Only an extraordinary showing of harm to the public interest from equitable relief or other prudential considerations could permit these alleged, continuing constitutional violations to remain unchecked by the federal court's remedial powers. Viewing the plaintiffs' pleadings favorably as we must, any harm to the public interest from injunctive relief is merely illusory.

### a. The Location of the Land Does Not Bar Relief

The location of the plaintiffs' land in a foreign country does not prevent the district court from granting relief. Courts often properly issue equitable decrees involving property outside the jurisdiction of the court.[57] When, as here, the court adjudicating the controversy has personal jurisdiction over the defendants, the extraterritorial nature of the property involved in the litigation is not a bar to equitable relief. Under such circumstances, courts in equity do not hesitate to order the defendants, who are present before the court, to do or refrain from doing something directly involving foreign property. As the Supreme Court stated in *Phelps v. McDonald:*

Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, *whether it be real or personal property,* is beyond the terri-

---

rights in the plaintiffs' land, it cannot be said that the plaintiffs have a duty to cease use and occupancy of *their own property* in the face of allegedly unconstitutional activity by the defendants. The majority's statement asserts a position more extreme than the defendants themselves are willing to defend.

**56.** See, e.g., Kent v. Dulles, 357 U.S. 116, 129–130, 78 S.Ct. 1113, 1119–1120, 2 L.Ed.2d 1204 (1958); *Reid v. Covert*, 354 U.S. 1, 77 S.Ct.

1222, 1 L.Ed.2d 1148 (1957); *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

**57.** See E. Messner, *The Jurisdiction of A Court of Equity Over Persons to Compel the Doing of Acts,* 14 Minn.L.Rev. 494, 500 (1930); 11 C. Wright & A. Miller, Federal Practice & Procedure §§ 2942–45 (1973).

torial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitae, which he could do voluntarily, to give full effect to the decree against him. Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam . . . . [58]

Second, courts are especially willing to grant equitable relief involving property outside the court's jurisdiction when the law of the court's jurisdiction governs the controversy instead of the law of the situs.[59] Here the plaintiffs' causes of action against the U.S. officials named as defendants arise under U.S. laws and the U.S. Constitution. As such, federal law provides the rules of decision for plaintiffs' claims. If Honduran law becomes relevant to the dispute, it cannot operate of its own force in this controversy but must apply only to the extent that the federal law adopts it or deems it relevant. The occasional deference in equity to the courts of the situs state in actions involving trespass brought under the situs state's law is inapposite here.

Third, courts will not hesitate to issue equitable decrees involving foreign land when there is no compelling reason to require that relief be sought in the territory of the property.[60] It is difficult to conceive of any plausible reason why the U.S. plaintiffs should be forced to bring their claims in the foreign courts of Honduras. Plaintiff Ramirez, a U.S. citizen, has alleged violations of his constitutional rights by officers of the United States. A requirement

that such a constitutional claim be brought in Honduran courts is a gross distortion of the doctrine of equitable discretion.

b. Honduran Law is Not Impugned

Furthermore, it cannot be concluded on this appeal of the dismissal that equitable relief would impugn foreign law or determine the legality of the actions, if any, of the Honduran military under Honduran law. An equitable decree would not challenge the sovereignty of Honduras because it would only adjudicate the rights of plaintiffs under U.S. law *vis a vis* the U.S. officials named as defendants.[61] Furthermore, there has not been any act of the Honduran state that could be impugned by an equitable decree. Honduras has not made any claim to ownership rights in plaintiff Ramirez's ranch according to the plaintiffs' set of facts. In addition, the extent, if any, to which Honduran military forces are participating in the military training exercises is a controverted fact and cannot be considered in determining whether equitable relief is barred and dismissal is proper at this time. Even if the plaintiffs' set of facts must imply at least some limited decree of complicity by Honduran military officials in the alleged unconstitutional seizure of plaintiffs' ranch, the mere fact of the defendants' commingling American with foreign troops or the acquiescence of foreign military officers cannot deprive this court of its authority to correct constitutional violations by means of properly tailored equitable relief against *United States* officers.[62] Any contention to the contrary

---

**58.** 99 U.S. (9 Otto) 298, 308, 25 L.Ed. 473 (1879) (emphasis added).

**59.** *See* sources cited *supra* note 57.

**60.** *Id.*

**61.** The majority misconstrues this action as one under Honduran law. *See* maj. op. at 150.

**62.** Furthermore, the majority's contention that Honduran participation deprives the district court of authority to order equitable relief is actually an impermissible decision of the merits of plaintiffs' case on an appeal of a dismissal. The extent to which the cooperation of a for-

eign government can deflate a U.S. citizen's claims of unconstitutional action by Executive officers is unrelated to whether damages or equitable relief is the appropriate remedy. It goes to the question whether any constitutional rights are violated by the specific facts presented. *See United States v. Hensel,* 699 F.2d 18 (1st Cir.1983), *cert. denied,* —— U.S. ——, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983) (Collaboration with Canadian authorities does not shield U.S. officials from claims alleging a violation of the Fourth Amendment by a search and seizure in Canadian waters.); *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976).

is simply not consistent with the doctrine of equitable discretion.[63]

### c. Separation of Powers Concerns Do Not Bar Relief

It is not necessary to linger over the long line of cases that permit judicial relief for unlawful or unconstitutional action by officers of the Executive Branch of the government, including relief against unlawful actions taken in the context of foreign and military affairs.[64] As Chief Justice Taney stated in *Mitchell v. Harmony,* the foreign affairs context of Executive action cannot shield unlawful conduct from judicial inquiry. "[A U.S. officer's] distance from home, and the duties in which he is engaged, cannot enlarge his power over the property of a citizen, nor give to him, in that respect, any authority which he would not, under similar circumstances, possess at home."[65] Those Supreme Court words are applicable—squarely, without distinction or modification—to plaintiff Ramirez's case here.

That unlawful and unauthorized military activity is remediable by equitable relief has been reaffirmed by the Court on numerous occasions. In *Gilligan v. Morgan* the Court noted that separation of powers concerns cannot prevent military officers from being accountable for specific unlawful conduct "whether by way of damages or injunctive relief."[66] And in upholding an injunction against the Brigadier General of the Texas National Guard for unlawful interference with private property, the Court stated:

Whether or not the injured party is entitled to an injunction will depend upon equitable principles; upon the nature of the right invaded and the adequacy of the remedy at law. If the court finds that the limits of executive authority have been transgressed, and that in view of the character of the injury equitable relief by injunction is essential in order to afford the protection to which the injured party is entitled, it can not be said that the judicial power is fettered because the injury is attributable to a military order.[67]

While *Laird v. Tatum* counsels against continuous judicial monitoring of Executive policy-making, the Court there stated that it *is* the role of the courts within the constitutional scheme to adjudicate and remedy claims of actual injury resulting from specific, unlawful Executive action.[68] Such is the nature of the claim presented here.

Furthermore, the plaintiffs' set of facts does not show that the Executive's conducting of foreign affairs would be impaired by an equitable decree that required the defendants to abide by U.S. constitutional and statutory requirements. Carefully tailored equitable relief might correct the allegedly unlawful condition without challenging the United States' relations with any Central American country or its military policies in the region.[69] Separation of powers considerations do not fell plaintiffs' complaint.

### d. Enforcement and Supervisions Problems Are Not Presented

A conclusion that the enforcement of any equitable decree would require an imper-

---

**63.** *See, e.g., United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952) (adjudicating a claim that U.S. military officials unlawfully destroyed plaintiff's property in the Philippines).

**64.** *See Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Duncan v. Kahanamoku,* 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946).

**65.** 54 U.S. (13 How.) 115, 133, 14 L.Ed. 75 (1852).

**66.** 413 U.S. 1, 11–12, 93 S.Ct. 2440, 2446–2447, 37 L.Ed.2d 407 (1973).

**67.** *Sterling v. Constantin,* 287 U.S. 378, 403, 53 S.Ct. 190, 197, 77 L.Ed. 375 (1932) (federalism concerns and the context of executive action do not bar relief).

**68.** 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2326–2327, 33 L.Ed.2d 154 (1972).

**69.** The court might, for example, confine the military training activity to publicly owned property.

missible degree of judicial supervision[70] rests entirely on assumed facts neither presented nor suggested by plaintiffs' complaint. The court should assume that the defendants, all officers of the United States present in Washington, D.C., will obey a decree of the district court. This country has a long tradition of government reliance on the military to uphold and enforce judicial decrees,[71] which belies an assumption that the defendants will flout an equitable order of the federal Judiciary. Furthermore, there is simply no factual basis for concluding that an equitable decree would involve this court in numerous or even any compliance disputes. The majority impermissibly concludes that there are only two options for equitable relief—enjoining the defendants from using the plaintiffs' land or confining the defendants to adjacent public lands—and that both of these remedies are rife with compliance problems. But the plaintiffs' set of facts nowhere indicates that alternative sites for the training camp are "adjacent" to the plaintiffs' land, nor that training activities are incapable of confinement to a particular acreage by such means as voluntary compliance or the erection of fencing. The barring of relief on the grounds of enforcement and compliance problems relies on facts which all parties may contest and which are not presented by the plaintiffs' pleadings.[72]

Thus, none of the factors which might counsel restraint in the granting of injunctive relief apply to this case, viewed favorably to the plaintiffs, as we must on the appeal of the district court's dismissal.

Even if the plaintiffs' pleadings did reveal some prudential considerations weighing against equitable relief, a balancing of the equities on the plaintiffs' set of facts shows that equitable relief would be squarely within the discretion of the district court. The majority opinion totally ignores the equities on the plaintiffs' side of the case as well as the interest of the public in upholding the Constitution, and denies relief by misconstruing the plaintiffs' claims and relying on facts outside of the plaintiffs' pleadings. Nothing in the plaintiffs' pleadings deprives the district court of its authority to remedy the continuous, unconstitutional occupation and effective seizure of plaintiffs' land and destruction of plaintiffs' livelihood by military officers of the United States as alleged here. Plaintiffs have stated a claim for which relief can be granted.

### 3. Declaratory Relief

The plaintiffs have also succeeded in stating a claim for declaratory relief. The express purpose of the Declaratory Judgment Act was to create a milder, less coercive form of relief than the injunctive remedy.[73] Although in some contexts, a declaratory judgment may have the same adverse effect on the defendants and the public as injunctive relief,[74] in most situations a declaratory judgment is less intrusive than a specific injunctive order would be.[75] Such is the case here. In assessing the propriety of declaratory relief, the equities in favor of granting the plaintiffs relief for the claimed constitutional violations remain

---

**70.** See 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2942 at 376–79 (1973); cf. Edelen v. W.B. Samuels & Co., 103 S.W. 360, 126 Ky. 295 (1907) (court declined to grant equitable relief when it would have required supervising a business for 5 years).

**71.** For a detailed account of the history of the U.S. government's reliance on the military to enforce the law, see Laird v. Tatum, 408 U.S. 1, 16–33, 92 S.Ct. 2318, 2327–2335, 33 L.Ed.2d 154 (1972) (Douglas, J., dissenting).

**72.** The court can hear evidence of alleged noncompliance if and when a dispute arises and can determine appropriate penalties at that time.

**73.** 28 U.S.C. § 2201 (1976 & Supp. V 1981). See Developments in the Law: Declaratory Judgments, 62 HARV.L.REV. 787, 787–790, 874 (1949); E. BORCHARD, DECLARATORY JUDGMENTS 3–15 (2d ed. 1941); 10A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2751 (2d ed. 1983).

**74.** See Samuels v. Mackell, 401 U.S. 66, 69–74, 91 S.Ct. 764, 766–768, 27 L.Ed.2d 688 (1971) (when state criminal prosecution had begun prior to federal suit, injunctive and declaratory relief had same effect and must be judged by the same standards).

**75.** See sources cited supra note 73.

equally strong, while any prudential considerations that may detract from the obvious propriety of injunctive relief on the plaintiffs' asserted facts are even more transparent.

A declaration of the plaintiffs' rights could provide the defendants with options for compliance that a specific injunctive order might not. If the district court declared that the defendants' seizure of the plaintiffs' property is unconstitutional, the defendants might, depending on the violation and the order, choose to seek congressional authorization for the seizure, or to cause a lawful expropriation of the plaintiffs' property, or to restrict activities to publicly held land, or to settle with the plaintiffs, or to take other appropriate action. That one of the defendants' options might involve compensation to the plaintiffs does not deprive the district court of jurisdiction to declare the rights of the parties.

Furthermore, even if a declaration by the district court could later be used as the basis for monetary relief, that possibility does not deprive the district court of authority to grant the requested relief.[76] Declaratory relief is improper only if the plaintiffs' action is a mere pretext to avoid the exclusive jurisdiction of the Claims Court.[77] Plaintiffs' complaint states a claim within the jurisdiction of the district court that is neither wholly insubstantial nor frivolous. As such, *Bell v. Hood*[78] requires that the district court take jurisdiction of the claim. A conclusion that declaratory relief is barred by the exclusive jurisdiction of the Claims Court impermissibly decides the merits of plaintiffs' claims on review of a dismissal, because it necessarily holds that the defendants' seizure of the property was authorized by U.S. laws and the U.S. Constitution.

## IV. CONCLUSION

The plaintiffs' pleadings outline a classic case for injunctive or declaratory relief entitling them to go forward on the merits in the federal district court. Instead, the majority has gone to extraordinary lengths to deprive plaintiff Ramirez of an opportunity for relief from the continuing unconstitutional invasion of his property rights alleged here. It has warped the doctrine of equitable discretion into a jurisdictional bar, while distorting the plaintiffs' set of facts and their claims in order to affirm dismissal for failure to state a claim for relief.

In affirming the dismissal of the plaintiffs' claim, the majority departs from a long tradition of the exercise of federal remedial powers to vindicate individual rights overridden by specific, unconstitutional military actions. It ignores the Nation's historic commitment to protecting private citizens' rights against military excesses, the spirit of which is embodied in the Third Amendment's express prohibition against the forced quartering of soldiers in private homes.[79] Charges that U.S. military officers are unconstitutionally housing over 1,000 soldiers on a U.S. citizen's private ranch cannot conscionably be nullified by this court for failure to state a claim for relief.

The majority errs gravely when it announces that the thwarting of such unconstitutional military activity is beyond the remedial authority of the federal Judiciary. I do not accept the proposition that a United States district court is powerless to stop a continuing violation of a U.S. citizen's constitutional rights, and that instead the citizen can only obtain monetary relief after the event in the Claims Court. Nor do I accept the proposition that a United States

---

**76.** See *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981) (district court does not lose jurisdiction simply because its declaratory judgment may later become the basis for a monetary judgment).

**77.** See *Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 823–24 (10th Cir.1981).

**78.** 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

**79.** No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law. U.S. CONST. amend. III.

district court should decline for prudential considerations to intervene to arrest ongoing constitutional violations, when the alleged perpetrators are officials of the Executive Branch, amenable to process and supervision here in Washington, D.C. It simply cannot be the law that this American plaintiff is relegated to damages or to the courts of a foreign country for redress of injuries caused by United States officials' ongoing, unconstitutional destruction of his ranch, his property, his livelihood, and his personal safety as claimed.[80]

I respectfully but emphatically dissent.

### APPENDIX

November 18, 1983
Tegucigalpa, D.C. Honduras

### URGENT

Ambassador John Dimitri Negroponte
United States Ambassador to Honduras
United States Embassy
Tegucigalpa, D.C. Honduras
Dear Mr. Ambassador:
With the utmost urgency I am informing you by hand courier that United States Armed Personnel with Tanks have invaded our Plant Premises at Puerto Castilla this afternoon. We have tried to reach by telephone both you and Mr. Sheppard Lohman and have been told that you are not available.

Mr. Ambassador, there is no excuse for U.S. Troops to be in our property. Mr. Lohman and Cnel. Jerry Clark gave us assurances yesterday that they would not invade our land and/or premises. Mrs. Sarah Horsey and Mr. Al Barr had also so stated on Monday 14th.

At 15.40 hours CST when I am dictating this letter we have reports that there are four Tanks inside with supporting infantrymen. The Tank Commander came to our Office Gate inside the yard and de-

manded the keys to the gates of all other areas. He was told to leave and that no keys were to be given to him. He then gave order to his company to proceed and go thru our property. At this time we have no reports from our ranch.

Inasmuch as the U.S. Government had been forewarned and foretold not to go into my properties and its Diplomatic and Military Representatives had assured no U.S. Troops would violate my rights and property I hereby advise you that we hold all those responsable Legally and Morally Liable.

Sincerely
/s/
Temistocles Ramirez de Arellano

---

**80.** A recent letter from plaintiff Ramirez to the U.S. Ambassador to Honduras has been filed with the court in response to a post-argument filing by the U.S. defendants. Attached as an Appendix to this dissent, the letter describes current events typical of those alleged by plaintiff Ramirez in his complaint. These claimed events prompted plaintiff Ramirez to resort to the U.S. courts as his only protection.